UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEVIN SIERRA-LOPEZ ,

                    Plaintiff,

          v.                                    Case No. 17-cv-1222-pp

BROWN COUNTY, *et al.*,

                    Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 36), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 43), DENYING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT (DKT. NO. 41), DENYING MOTION TO INTERVENE (DKT. NO. 77), DENYING PLAINTIFF'S MOTION FOR ALTERNATIVE DISPUTE RESOLUTION (DKT. NO. 80) AND DISMISSING CASE**

          The plaintiff, a state prisoner, deliberately cut his right arm with a pencil while incarcerated at the Brown County Jail ("the jail"). In a screening order, the court allowed him to proceed on claims under 42 U.S.C. §1983 alleging that staff at the jail failed to protect him from harming himself, failed to treat the wound on his arm properly and failed to train jail staff. He is also proceeding with a claim that Brown County violated his First Amendment right to practice his religion. Dkt. No. 14. Although it has little to do with the other claims in this lawsuit, the plaintiff properly joined the last claim due to the overlap of Brown County as a defendant in the failure-to-train claim. Fed. R. Civ. P. 18(a); <u>George v. Smith</u>, 507 F.3d 605, 607 (7th Cir. 2007).

          On January 17, 2019, the plaintiff filed a motion for summary judgment and supporting documents. Dkt. Nos. 36-40. He also filed a motion seeking default judgment against one defendant, Nurse Pagels. Dkt. Nos. 41-42. The following month, the remaining defendants (apart from Nurse Pagels) filed a

motion for summary judgment, supported by numerous declarations and exhibits. Dkt. Nos. 43-62. The plaintiff then filed a combined response/reply brief and additional supporting materials. Dkt. Nos. 63-68. (This combined brief is a reproduction of his initial brief, with six pages of new argument added at the end.) The inmate assisting the plaintiff in filing his briefs also filed a motion to intervene. Dkt. No. 77. Finally, the plaintiff filed a motion seeking alternative dispute resolution. Dkt. No. 80. The court will deny the plaintiff's motions, grant the defendants' motion and dismiss the case.

## I.    FACTS

The plaintiff's deliberate indifference claim arises out of the events of July and August 2016, during which the plaintiff, a Wisconsin state inmate, was temporarily incarcerated at the jail for the purpose of attending court. Dkt. No. 14 at 10 n.1. When they booked the plaintiff on July 18, 2016, jail staff assessed the plaintiff's risk of suicide. Dkt. No. 45 at ¶42. The jail uses a standardized form called a Suicide Screening Questionnaire, which indicates that the plaintiff denied ever attempting suicide and denied that he had any thoughts of doing so currently. Dkt. No. 46-4. The officer who completed the form indicated that the plaintiff "does not appear suicidal." Id.

At booking, jail staff assigned the plaintiff to a unit known as the Fox Pod, which is designed for high-risk inmates and those placed in segregation for punitive reasons. Dkt. No. 45 at ¶30. The jail placed the plaintiff in that unit due to major rules violations he had committed during previous incarcerations at the jail. Id. at ¶44. In fact, the plaintiff was no stranger to the jail or its jailors, having been incarcerated at the jail approximately twenty-two times in the last decade. Id. at ¶38. Among other restrictions, the Fox Pod

strictly limits inmate activities to one hour per day of recreation time, and its rules allow inmates to possess only two books at a time—one religious and one non-religious. Id. at ¶32. An inmate may take one shower per day, which must occur during the inmate's recreation time. Id. at ¶¶32-34.

At about 10:00 a.m. on July 29th, guards escorted the plaintiff to the showers. Id. at ¶46. The plaintiff stated that the shower was too cold, so he tried a second shower, which proved hot enough initially but then turned cold. Id. at ¶48. Maintenance staff agreed that the first shower wasn't "as warm as it could be," but they couldn't fix it; the defendants indicate that the second shower was 104 degrees. Id. at ¶49; Dkt. No. 46-6 at 8. Maintenance had tested the showers earlier in the week due to other inmate complaints. Id. Contemporaneous jail notes indicate that the plaintiff believed taking a cold shower would cause him to "get sick and die," so he refused a shower that morning but also explained that he would like to take a shower once the problems were fixed. Id.

Defendant Officer Kozak spoke with the plaintiff at approximately 4:00 that same day. Dkt. No. 45 at ¶52. During that discussion, Kozak informed the plaintiff that defendant Corporal Dequaine had given instructions that the plaintiff would not have another opportunity to shower that day. Id. The plaintiff responded by saying he was suicidal. Id. at ¶53. The defendants assert that Kozak and the plaintiff continued to talk, that the plaintiff eventually calmed down, and that Kozak questioned the plaintiff about whether he was feeling suicidal or thinking about hurting himself. Id. at ¶¶54-59. While the plaintiff did not respond to Kozak's inquiries, the defendants indicate that the

plaintiff did not appear to Kozak to be angry or sad and wasn't displaying signs one might associate with an inmate who was planning to harm himself. Id.

The plaintiff asserts that Duquaine instructed Kozak to tell the plaintiff, "No matter what you do, you're not getting a second shower." Dkt. No. 38 at ¶36. The plaintiff also says that at some point, he spoke to Kozak on the in-cell intercom and told Kozak that he was suicidal and was going to cut himself. Id. at ¶30. The defendants dispute that the plaintiff stated an intent to cut himself. Dkt. No. 53 at ¶30. The plaintiff alleges that at some point after seeing Kozak he covered his cell window with paper, dkt. no. 38 at ¶29, but the defendants dispute this, too, dkt. no. 53 at ¶29.

At any rate, about ten minutes after talking with the plaintiff, Kozak called Dequaine to inform him about the plaintiff's statement regarding being suicidal. Dkt. No. 45 at ¶61. Duquaine told Kozak to monitor the plaintiff and to let Duquaine know if the plaintiff's behavior changed. Id. at ¶62. Neither Kozak nor Dequaine informed anyone in the jail's psychological services unit that the plaintiff had indicated a suicidal intent. Dkt. No. 38 at ¶35. Dequaine states that in his experience, the plaintiff had a long history of claiming to be suicidal as a means of manipulating jail staff, dkt. no. 55 at ¶8; Kozak, defendant Lieutenant Rhode and Captain Michel (not a defendant) had a similar experience, dkt no. 45 at ¶40.

Dequaine informed Rhode that although the plaintiff was angry about being denied the opportunity to shower and had threatened suicide, Fox Pod officers could see him in his cell, apparently doing legal work. Dkt. No. 45 at ¶63. Kozak served the plaintiff his dinner around 4:15 and found the plaintiff "conversational," id. at ¶64; when Kozak picked up the tray at 4:30, the

4

plaintiff had eaten, and spoke "Normally" to Kozak, id. at ¶65. At 4:35, Kozak saw the plaintiff interacting with the nurse who was giving the plaintiff his medication; again, Kozak perceived that the plaintiff was acting normally. Id. at ¶66. Around 5:05, Duquaine came to the pod and asked about the plaintiff, and Kozak reported that the plaintiff was behaving normally, continuing to work quietly on legal work. Id. at ¶67.

Kozak left the Fox Pod to move another inmate; when he returned around 5:30 he started on his rounds to check on the inmates. Id. at ¶69. The inmate in a cell neighboring the plaintiff's pressed his emergency intercom button and stated that the plaintiff was suicidal. Id. at ¶70. Kozak heard the intercom, went to the dayroom and saw the inmate who'd pushed the intercom gesturing toward the plaintiff's cell. Id. at ¶71. In the incident report he wrote on July 29, Kozak explained what happened next:

> I looked inside cell F103, where Sierra-Lopez is housed, and saw him cutting himself on the right arm. I ordered Sierra-Lopez to stop what he was doing and radioed for back[up] to come to Fox Pod for an inmate cutting himself with what appeared to be a pencil. I continued to order Sierra-Lopez to stop what he was doing.

Dkt. No. 54-1 at 2. Several officers responded to the scene, one of whom observed the plaintiff ingest several pills, which turned out to be ibuprofen. Dkt. No. 45 at ¶¶75-76. The plaintiff asserts that the pills were "psychotropic pills," dkt. no. 38 at ¶41, while the defendants indicate that the only medication the plaintiff was receiving was ibuprofen[1] and no other inmates in

---

[1] Defendant Nurse Pagels's notes from later that evening indicated that the plaintiff also took venlafaxine (an antidepressant) at noon, and loratadine (an antihistamine) in the morning. Dkt. No. 46-8 at 33.

the dayroom had accepted medication, dkt. no. 45 at ¶80. The officers were able to convince the plaintiff to come out of his cell, and placed him in a restraint chair. Id. at ¶77. They moved him into the dayroom, where defendant Nurse Pagels inspected and cleaned the cut. Id. at ¶78. Her patient notes describe the injury:

> A 2 inch wound to patient's right forearm was seen. Moderate amount of bloody drainage covered the area in addition to blood that was seen on patient's clothing. Area was cleansed with NaCI 0.9% and then was covered with 4x4 gauze, ABD pad, and Krilex. When asked why patient hurt himself, patient stated, "Because I don't get to take a shower everyday and I wanted the corporal to know that he can't treat me like this as well as HSU not giving me my records about my UA [urinalysis] because per policy I am allowed to get my records for free unless I damage the original copy". Then patient became verbally aggressive towards LPN when she stated that she would come back to check on him and recheck his dressing.

Dkt. No. 46-8 at 32. Pagels classified the wound as a "superficial cut or scrape to his arm where an existing scar was already." Dkt. No. 45 at ¶86. The plaintiff says that when Pagels asked him why he'd cut himself, he said, "Because I can not take being confined to a cell 24 hours per day, seven days a week [] without day room, visits, recreation, phone calls, religious material . . . or services provided [] [a]nd without having any meaningful treatment for my psychological (mental) treatment." Dkt. No. 38 at ¶43.

The plaintiff says that when Pagels told him she'd clean and dress the wound and come back later, he said, "You can't punish me for being suicidal. I need stitches!" Id. at ¶46. He indicates that the gauze Pagels put on his wound "dried and got stuck in the blood." Id. at ¶47. The plaintiff alleges that Pagels ripped the gauze off, causing the wound to bleed again, then sprayed it and

applied some cream. Id. He indicates that he reiterated that he needed stitches, and that what Pagels was doing was "wrong" and was causing him more pain. Id. The plaintiff says he told Pagels that he didn't want a bandage or gauze, that she responded by grabbing his arm, and he told her not to touch him and to leave him alone. Id. at ¶48. He says that a Nurse Blozinski (not a defendant) cleaned and dressed the wound. Id. Blozinski made notes on July 30, 2016, stating that there was "no redness to area; dry blood scabbed over area of wound. . . . Patient tolerated cleaning well and no other concerns at this time." Dkt. No. 46-8 at 34. The plaintiff says that Blozinski saw him on July 31, 2016, and he told her how Pagels had put gauze on the wound. Dkt. No. 38 at ¶48. He claims that Blozinski told him that Pagels should not have put gauze on an open wound because the blood would dry and cause the gauze to get stuck. Id. According to the defendants, the wound was "monitored, cleaned, and treated with antibiotic ointment on July 30, 2016; July 31, 2016; and August 4, 2016." Dkt. No. 45 at ¶89. On July 31, 2016, he was given ibuprofen for the pain, and on August 4, 2016, he got a packet of antibiotic ointment that he could apply himself. Id. Blozinski saw the plaintiff a week later, on August 6, and her notes make no mention of the cut. Dkt. No. 46-8 at 59. There is no further discussion of the cut in subsequent medical treatment notes.

The plaintiff asserts that because of the wound and Pagels's alleged improper treatment, he had pain and discomfort "well into 2018." Dkt. No. 38 at ¶51. He says that on March 30, 2018—almost two years after the incident—he was taken to U.W. Health for "follow up 1 week status post open septo-rhinoplasty with placement of spreader grafts, columellar struts as well as excisions and primary closure of a right forearm scar." Id. Hospital records

show that in March 2018, the plaintiff had nasal surgery to repair his deviated septum, and that he also had "a painful scar on his right forearm," which the doctors planned to "excise." Dkt. No. 40-1 at 20-27 (quotes from p. 27).

The plaintiff's First Amendment claim stems from his allegations that the Chaplain told him that she had sent him some religious books and songs that he'd never received, and that he'd come to learn that other inmates at the jail also had not received religious materials. Dkt. No. 14 at 8. On July 29, 2016—the same day as the self-harming incident—the plaintiff filed a grievance indicating that he had not received the religious materials from the Chaplain. Dkt. No. 68-1 at 5. The defendants indicate that the individual who investigated the grievance found no evidence to support it, and that the grievance was closed August 3, 2016. Dkt. No. 45 at ¶¶92-93. Chaplain Karen Konrad indicates that she has no reason to believe that any jail staff ever have withheld materials from inmates who are entitled to them, and it is her experience that the jail administration has been supportive of inmate religious practices. Dkt. No. 56 at ¶¶6-7. The defendants explain why Fox Pod inmates are allowed only one religious book at a time—to keep them from tearing out pages and covering their cell windows or using the pages to clog drains to flood their cells. Dkt. No. 45 at ¶¶101-103. The plaintiff alleges only that "there had been a systemic practice of denying prisoners religious materials prior to the plaintiff coming to [the jail]." Dkt. No. 38 at ¶50.

## II.    MOTIONS FOR SUMMARY JUDGMENT

The plaintiff has asked for summary judgment, dkt. no. 36, as have defendants Brown County, Dequaine, Higgins, Kozak and Rhode, dkt. no. 43. The court will deny the plaintiff's motion and grant the defendants' motion.

A. Defendants Higgins, Kozak, Dequaine and Rhode—Deliberate Indifference

1. *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

2. *Analysis*

a. Preliminary Issues

The plaintiff's response to the defendants' proposed findings of fact objects to many the proposed findings on the ground that they are not supported by "admissible evidence." Dkt. No. 64 at ¶¶59, 63-67, 85-86. For example, the plaintiff disputes that Kozak served him dinner and later collected the dinner tray, finding the plaintiff behaving normally. Id. at ¶¶64, 65. He disputes that Kozak checked on him in half-hour increments. Id. at ¶67. The plaintiff's response/reply brief asserts that the incident reports defendants the defendants submitted are inadmissible. Dkt. No. 63 at 19-23. But the defendants' proposed findings, and the underlying incident reports, are based on the defendants' own eyewitness perceptions of events; the defendants personally witnessed or participated in the events they recounted in the findings and incident reports. If they came into court, they would testify that they saw and heard the things they described in the findings and incident

reports. First-hand, eyewitness testimony is direct evidence that something happened, and the reports are direct evidence that is relevant to the plaintiff's claims. The plaintiff states some of the allegedly inadmissible facts in his own amended complaint, see, e.g., Dkt. No. 13 at ¶¶25, 26, so it is unclear why he believes they are inadmissible if they come from the defendants.

The plaintiff objects to Pagel's description of his cut as a "superficial cut or scrape," arguing that there is "no reliable or admissible evidence to support" the defendants' proposed finding of fact on that issue. Dkt. No. 64 at ¶86. In support of their reply brief, the defendants included a photo of the cut; the court would not describe the cut in that photo as "superficial." Dkt. 70-2 at 4. But the defendants do not dispute the seriousness of the plaintiff's injury, so regardless of how Pagels might have characterized the cut, the court assumes that it was serious.

In his reply brief, the plaintiff alleges that Kozak and Dequaine submitted "falsified self-serving, after the fact 'incident reports.'" Dkt. No. 63 at 19. He implies that because a document he received later in the case is not identical to an incident report he received in discovery, it is fabricated. Inconsistency does not equal fabrication. The plaintiff has had the opportunity to argue the inconsistency.

The defendants assert that the plaintiff "habitually claims to be feeling suicidal or threatens to engage in self-harm when he does not get something he wants and then retracts those threats if staff later acquiesces to his demands." Dkt. No. 45 at ¶40. The plaintiff responds that the defendants lack "clinical or psychiatric qualifications . . . to conclude if plaintiff . . . is feeling suicidal." Dkt. No. 64 at ¶40. The court will accept the plaintiff's objection at face value;

none of the defendants claim to have "clinical or psychiatric" qualifications. But the defendants do not need a medical degree to notice if an inmate has a pattern of threatening suicide or self-harm whenever he does not get what he wants. The plaintiff has not raised a dispute as to an issue of material fact regarding the defendants' proposed finding that the plaintiff regularly makes suicide threats as a means of getting what he wants.

The court acknowledges that the record contains evidence that the plaintiff has done more than *threaten* self-harm. The defendants provided staff notes from the plaintiff's "inmate notebook" in support of their motion. Dkt. No. 46-6. Those notes indicate that on April 23, 2016, the plaintiff reported to the health services unit ("HSU") that he was "urinating blood and semen because he put something up his penis." Id. at 4. On July 21, 2016—a week before the incident in this case—he reported that he had "stuck a paperclip in his penis" at a prior facility. Id. at 11. In their brief in support of summary judgment, the defendants referred the court to another federal case the plaintiff several years ago, in which he sued staff that the jail for events that occurred when he was there in May of 2014. Dkt. No. 44 at 18 (citing Sierra-Lopez v. Fatoki, Case No. 14-C-1480, 2017 WL 3172538 (E.D. Wis. July 26, 2017)). In that case, after the plaintiff told jail officers that he was suicidal, an officer saw him smearing blood on his cell door window; when the extraction team removed the plaintiff from the cell, staff determined that he had cut himself. Fatoki, 2017 WL 3172538 at *4.

Having said that, the record also references the fact that plaintiff discussed with staff the things he could do—including self-harm—if he did not get more privileges. Dkt. No. 46-6 at 11. In response to a report that the

plaintiff had a pill in his cell, a staff member went to see him; the plaintiff allegedly told the staff member that he "simply wanted to warn HSU that he gets various privileges because he is a nuisance at the jail and if not treated properly he will make everyone 'work harder.'" Id. On another occasion, a member of the staff told the plaintiff that the jail staff "will not likely be inclined to award him any additional freedoms or privileges if he continues to engage in negative Bx such as threatening to break his bones . . . ." Id. at 9. In the 2014 federal case referenced by the defendants, the plaintiff once told officers that he was suicidal; when a staff member appeared, he used the opportunity to complain about a finger splint. Fatoki, 2017 WL 3172538 at *4. On another occasion, the cold water in the plaintiff's cell stopped working. "When he became frustrated with the officers' attempts to solve the problem, he responded, 'Fuck that, I'm suicidal' and had to be transferred to an observation cell." Id. at *6.

The court observes that several factual disputes between the parties are not material to the plaintiff's claims. For example, the plaintiff says that he covered his window with paper after speaking with Kozak, while the defendants state that Kozak was able to see the plaintiff through the cell window, cutting himself, when Kozak arrived after the emergency call. Dkt. No. 64 at ¶54. The plaintiff's version of events contradicts his claim about covering up his window. He alleges that when staff arrived in response to the alarm, he held some pills up to show to jail staff before ingesting them. Dkt. No. 38 at ¶41. Had his window been covered, jail staff would not have been able to see him. Dkt. No. 53 at ¶41. In any event, whether the window was covered or not is not relevant to whether any of the defendants were deliberately indifferent. Perhaps it would

have been relevant if the evidence showed that the plaintiff had covered his window hours earlier—an obvious warning sign—and the defendants had disregarded the covered window by not checking on him. <u>Sanville v. McCaughtry,</u> 266 F.3d 724, 739 (7th Cir. 2001) ("In the five hours during which Matt's cell window was covered with toilet paper, there was no apparent attempt to discern whether he was stable.") There is no such evidence here— only the plaintiff's unsupported allegation that he covered the window after speaking with Kozak. This factual dispute is not material to the question of deliberate indifference.

The plaintiff asserts that he told Kozak he wanted to commit suicide and cut himself, while Kozak says that the plaintiff mentioned only suicide, not cutting. Dkt. No. 53 at ¶30. It is conceivable that the specificity of a threat of self-harm (*e.g.*, cutting oneself) could make a threat more credible. "[H]earing that an inmate plans to cut himself with a sharp object might, depending on the circumstances, put prison staff on notice that a plaintiff intended to injure himself." <u>Rivers v. Johnson,</u> No. 17-CV-1496-PP, 2019 WL 2411775, at *6 (E.D. Wis. June 6, 2019.) The court can't resolve this factual dispute at the summary judgment stage, so for purposes of the defendants' motion for summary judgment the court will take the facts in the light most favorable to the plaintiff and proceed as though the plaintiff did tell Kozak both that he felt suicidal and that he was going to cut himself.

Finally, the court allowed the plaintiff to proceed against Kozak, Dequaine, Higgins and Rhode. Dkt. No. 14 at 12. In the amended complaint, the plaintiff alleged that he told Kozak and Higgins that he felt like harming himself, and that neither of them notified the clinical or psychological services

13

unit. Dkt. No. 13 at ¶¶18-19. In his proposed findings of fact, the plaintiff said that he informed Kozak and Higgins that he felt like committing suicide and self-harm, then covered his cell window with paper. Dkt. Nos. 38 at ¶29, 66 at ¶29. These are allegations only—the plaintiff has provided no evidence that Higgins was involved in what happened on July 29, 2016. Higgins has provided a declaration that while he was assigned to Fox Pod that day, he does not recall having any interaction with the plaintiff. Dkt. No. 58 at ¶¶10, 11. Kozak makes no mention of Higgins in his declaration. Dkt. No. 54. The court will grant summary judgment in favor of Higgins without further analysis.

> b.    Deliberate Indifference to Risk of Self-Harm/Suicide

The facts that *are* relevant to the plaintiff's claim of deliberate indifference are these: the plaintiff informed Kozak at 4:00 that he was suicidal and thinking about cutting himself. Kozak believed that the plaintiff had made similar threats before as a means of trying to get what he wanted. The plaintiff also had a significant mental health history, had reported past attempts to harm himself and had harmed himself at the jail before. Kozak informed Dequaine about the suicide threat, and Dequaine informed Rhode. Dequaine instructed Kozak to monitor the plaintiff. On at least two occasions between 4:00 and 5:30, Kozak observed the plaintiff sitting in his cell, working on what appeared to be legal work. He says he served the plaintiff dinner, and later retrieved the meal tray, without incident. A nurse visited the plaintiff at roughly 4:35 to administer medication, again without incident. Dequaine stopped by the pod around 5:05, at which time Kozak reported that the plaintiff was working on paperwork in his cell. Kozak left the pod to transport another inmate, returning at 5:30. He heard an intercom call that the defendant was

suicidal and went to the plaintiff's cell door, where he saw the plaintiff cutting himself with what appeared to be a pencil. He ordered the plaintiff to stop and radioed for backup. Other officers arrived and were able to coax the plaintiff out of his cell. The plaintiff received treatment for the wound.

The plaintiff was a convicted inmate at the time of these events, so the court analyzes his claims under the Eighth Amendment. Cavalieri v. Shepard, 321 F.3d 616, 620 (7th Cir. 2003). A plaintiff who claims that a prison official exhibited deliberate indifference by denying him medical care must meet both an objective and a subjective component. Pittman ex rel. Hamilton v. Cty. of Madison, Ill., 746 F.3d 766, 775–76 (7th Cir. 2014). First, he must show that his medical condition was objectively serious. Second, he must show that the officials had a sufficiently culpable state of mind—that their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference" to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976). A prison official shows deliberate indifference to a risk of suicide or self-harm when the official is subjectively "aware of the significant likelihood that an inmate may imminently seek to take his own life" yet "fail[s] to take reasonable steps to prevent the inmate from performing the act." Collins v. Seeman, 462 F.3d 757, 761 (7th Cir. 2006) (citing Estate of Novack *ex rel.* Turbin v. Cty. of Wood, 226 F.3d 525, 530 (7th Cir. 2000)). The official must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and the official "must also draw the inference." Higgins v. Corr. Med. Servs. of Ill., Inc., 178 F.3d 508, 511 (7th Cir. 1999) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

###### i. **Serious Medical Need**

As to the objective component, the defendants have conceded that "suicide is a serious harm," dkt. no. 44 at 13, and they state that the objective harm element has been met. The court agrees that suicide is a serious harm, although some courts in this district have questioned whether a person who threatens suicide but doesn't cause himself serious harm faced an objectively serious risk. In Phillips v. Diedrick, No. 18-C-56, 2019 WL 318403, at *3 (E.D. Wis. Jan. 24, 2019), the court found that the inmate "did not engage in self-harm that caused a serious injury or present a serious risk of suicide. Instead, he used a small razor to make superficial cuts on his arm." And in Davis v. Gee, the plaintiff threatened suicide but ingested a non-toxic amount of Tylenol, which caused no distress. Davis v. Gee, Case No. 14-cv-617-WMC, 2017 WL 2880869, at *6 (W.D. Wis. July 6, 2017) (finding no serious harm). These courts concluded that the utterance of a suicide threat does not constitute "serious medical need" if what the plaintiff did to himself didn't look like a serious attempt at self-harm.

In this case, the court has concluded that based on the photo the defendants submitted, the cut on the plaintiff's arm appears to have been more than superficial. Perhaps one can imagine a case in which a plaintiff threatens to harm himself, and then does something so silly that it is obvious he didn't really mean it and that he was at no risk. This is not that case, and the defendants have conceded that the "serious medical need" objective component has been met. The court will move on to the subjective component—whether the defendants were subjectively aware of the significant likelihood that the

plaintiff might seek to take his life but failed to take reasonable steps to prevent him from doing so.

## ii. **The Defendants' State of Mind**

The court next considers whether the defendants were aware that there was a substantial risk that the plaintiff would seriously injure himself. Higgins, 178 F.3d at 511. The jail officer defendants all have stated that they believed that the plaintiff had a history of threatening to harm himself in order to manipulate staff. The evidence on the record provides support for that belief. Jail staff notes indicate, for example, that only a week earlier, while complaining to a staff member about his desire for more privileges, the plaintiff had discussed "things he could hypothetically do behaviorally or self-harming if he doesn't get his way regarding certain matters." Dkt. No. 46-6 at 11. The officers also appear to have known, however, that the plaintiff had a history of mental illness. (As the court also has observed, the record shows that the plaintiff had harmed himself in the past, although it does not indicate whether these jail officers knew that.)

The defendants point out that Kozak and Dequaine observed the plaintiff behaving "normally" in the one and one-half hours that followed his suicide threat—sitting in his cell doing paperwork, eating his dinner, taking his medication. The defendants assert that given the plaintiff's history of making false threats, it would have been reasonable for them to conclude that any threat the plaintiff made ninety minutes earlier, in the wake of his disappointment about being denied another opportunity to shower, was an attempt to manipulate them, not a real threat.

The defendants rely on <u>Collins</u> to argue that even if the defendants had a subjective awareness of an imminent threat to the plaintiff's safety, by the time the plaintiff cut himself, the threat had abated. <u>Collins</u>, 462 F.3d at 762. In <u>Collins</u>, the plaintiff told an officer he was suicidal, but "just a few minutes later he told the officer he would be all right until the crisis counselor arrived." <u>Id.</u> The Seventh Circuit concluded that even though Collins had told the officer that he was feeling suicidal—providing the officer with a subjective awareness of an imminent threat to Collins's safety—"that threat had substantially abated fifteen minutes later when Collins assured [the officer] he would be all right until the counselor arrived." <u>Id.</u> at 791. The defendants argue that Kozak's observations of the plaintiff after the suicide threat—seeing him working in his cell, serving him dinner, seeing him with the nurse—gave Kozak reason to believe that any threat of imminent harm had abated. Dkt. No. 44 at 16. The plaintiff responds that unlike Collins, he never told anyone he would be "all right." He remained silent in response to Officer Kozak's inquiries about whether he was suicidal or was thinking of harming himself. Dkt. No. 45 at ¶¶56-58.

One might read some of the plaintiff's assertions as admitting that Kozak and Dequaine did not have a subjective awareness that the plaintiff faced an imminent risk of harm. In his reply brief, the plaintiff states that Dequaine "had already concluded that plaintiff was lying and trying to manipulate staff into giving him another shower. And this also explain[s] why def. N. Dequaine and def. D. Kozak fabricated their incident reports . . . to cover-up the failed preventative actions that they could have took but refused to do so." Dkt. No. 63 at 22. If, as the plaintiff indicates, Dequaine and Kozak believe that the

plaintiff was "lying" about being suicidal, they could not have been subjectively aware that he was at serious risk of harming himself.

The court believes it unlikely that a reasonable jury would conclude on the evidence in the record that the defendants had a subjective awareness that the plaintiff faced an imminent risk of harm. But even if a reasonable jury might reach that conclusion, the plaintiff has not demonstrated that the defendants failed to take reasonable steps to protect him.

### iii.    The Defendants' Actions

 The evidence shows that far from ignoring the plaintiff's threat, the defendants took numerous steps to protect the plaintiff from a risk of harm. Kozak reacted to the threat immediately by talking with the plaintiff, calming him and asking him questions about whether he still felt suicidal or was thinking of harming himself. Kozak reported the threat to Dequaine, who instructed Kozak to monitor the plaintiff. Kozak then observed the plaintiff at least twice during the 4:00 hour. He watched the plaintiff take his medications. Dequaine reported the threat to Rhode, and Dequaine himself came by the pod to ask about the plaintiff at about 5:05. Kozak reported that the plaintiff was quiet, behaving normally, and doing legal work.

The plaintiff complains that Kozak, Dequaine and Rhode did not tell any medical or psychological staff about the plaintiff's threat. It appears that this is true. But the law does not require a defendant who knows about a risk to "take perfect action or even reasonable action[,] . . . his action must be reckless before § 1983 liability can be found." Cavalieri, 321 F.3d at 622. It was not reckless for Kozak to talk with the plaintiff, report the threat to Dequaine and monitor the plaintiff for the better part of an hour and a half. It was not

reckless for Dequaine to instruct Kozak to monitor the plaintiff, and to check on the plaintiff himself. It was not reckless for Rhode to accept Dequaine's representation that although the plaintiff had made a threat, Kozak since had observed him working in his cell.

In this way, the facts here do resemble those in <u>Collins</u>. The guards in <u>Collins</u> did not place the plaintiff on a formal suicide watch after his threat, instead subjecting him to additional monitoring. <u>Collins</u>, 462 F.3d at 759 ("Correctional officers checked on Collins twice more in the intervening thirty minutes and nothing was amiss.") The plaintiff hung himself with his bedsheet between these checks. The Seventh Circuit found that the guard did not "sit idle," visiting the inmate's cell three times. <u>Id.</u>; <u>cf.</u> <u>Sanville,</u> 266 F.3d at 739 ("In the five hours during which Matt's cell window was covered with toilet paper, there was no apparent attempt to discern whether he was stable. The guards did not use the video camera to check on Matt, nor did anyone take any action until approximately 3:00 p.m.").

At 5:30, when Kozak returned to the pod and heard the intercom call that the plaintiff was suicidal, he went straight to the plaintiff's cell. When he saw the plaintiff cutting himself, he ordered the plaintiff to stop and immediately called for backup. Several officers came, including Rhode (who, according to Kozak, helped talk the plaintiff out of his cell, dkt. no. 55 at ¶¶21, 23). Again, the defendants did not sit idly by. They reacted.

Arguably, the only way to prevent a determined inmate from harming himself would be to place him in restraints twenty-four hours a day. Even in a bare cell, with continuous monitoring, an inmate could bang his head against walls or doors, or use his own teeth and fingernails to cause serious self-injury

before the guards observing him have time to intervene. (The inmate notes reflect that the plaintiff had mentioned the length of his nails to staff on at least one occasion.) Short of twenty-four/seven restraint, prison staff cannot guarantee that an inmate will not harm himself. This is why cases finding liability, or even allowing a plaintiff to proceed to trial on liability, generally are limited to those situations in which the guards were essentially asleep at the switch or acted recklessly: "A state officer is deliberately indifferent when he does nothing . . . or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred." <u>Figgs v. Dawson</u>, 829 F.3d 895, 903 (7th Cir. 2016) (internal citations omitted). The plaintiff must show "something approaching a total unconcern" for the inmate's safety. <u>Rosario v. Brawn</u>, 670 F.3d 816, 822 (7th Cir. 2012) (citation omitted). <u>Cf.</u> <u>Vann v. Vandenbrook</u>, No. 09-CV-007-BBC, 2010 WL 148396, at *1 (W.D. Wis. Jan. 12, 2010) ("Plaintiff told Bittelman that he was feeling suicidal, and Bittelman responded by saying, 'You're not the only one,' and handed plaintiff a razor. Plaintiff used the razor to cut his arms 133 times.") The plaintiff has made no such showing here. No reasonable jury could conclude on the evidence in this record that the defendants failed to take steps to protect the plaintiff. "The most that [could] be said . . . is that [the defendants] were negligent in failing to keep a closer eye on [the plaintiff] than they did." <u>Mathis v. Fairman</u>, 120 F.3d 88, 92 (7th Cir. 1997). That does not suffice to show deliberate indifference.

3.    *Qualified Immunity*

The defendants also argue that they are entitled to qualified immunity. Where the defendant "wins on the facts, [he] does not need qualified

immunity." <u>Viero v. Bufano</u>, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); <u>Antepenko v. Domrois</u>, No. 17-CV-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018) ("Because the court grants summary judgment on the merits, the court does not need to address the qualified immunity argument.") The court need not address whether the defendants are entitled to qualified immunity, because the court is granting judgment in their favor on the merits of the claim.

B.    <u>Defendant Pagels—Deliberate Indifference in Treating Wound/Default Judgment</u>

The plaintiff filed a motion asking the court to award him default judgment against Nurse Pagels, a non-county employee. Dkt. No. 41. The process receipt and return on file shows that the U.S. Marshal served Pagels on October 22, 2018. Dkt. No. 31. Under Fed. R. Civ. P. 12(a)(1)(A)(i), Pagels had twenty-one days to answer or otherwise respond; she has not done so. But the plaintiff is not entitled to default judgment, for two reasons.

First, the plaintiff did not comply with the requirements of Fed. R. Civ. P. 55. There are two parts to the default judgment process. Rule 55(a) requires that the plaintiff first must ask the Clerk of Court to enter default. Only after the clerk has entered default may the plaintiff ask the judge to award default judgment in his favor under Rule 55(b). The plaintiff did not first ask the clerk to enter default. The court understands that the plaintiff is not a lawyer, but he must follow the rules like anyone else. He did not do so here.

Second, there is more to obtaining a default judgment than showing that the defendant did not respond to the plaintiff's allegations. Once a clerk enters default, "[a] defendant admits all of the 'well-pleaded' factual allegations in the complaint against him . . . , with the exception of those factual allegations

relating to damages." <u>DirecTV, Inc. v. Ouimette</u>, Case No. 03-cv-1337, 2005 WL 8163010, at *2 (E.D. Wis. Feb. 23, 2005) (quoting <u>Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.</u>, 722 F.2d 1319, 1322 (7th Cir. 1983)). "Factual allegations are well-pleaded if they are "susceptible of proof by legitimate evidence and are not contradicted by other allegations in the complaint or facts in which the court may take judicial notice." <u>Id.</u>

The amended complaint alleges that after officers removed him from his cell, Pagels asked him why he'd cut himself, and he told her it was because he couldn't take the deprivations of confinement any longer. Dkt. No. 13 at ¶32. The amended complaint says the plaintiff told Pagels that he'd informed staff of his intent to commit suicide or harm himself and staff hadn't acted to stop him. <u>Id.</u> at ¶33. It says that Pagels told the plaintiff that she'd wipe his wound and put gauze on it, then come back after medications pass. <u>Id.</u> at ¶34. The amended complaint asserts that the plaintiff told Pagels he needed stitches, but that she left the area. <u>Id.</u> at ¶35. It appears that later that evening—after the plaintiff spoke with the Chaplain and the pastor at 7:15—the gauze that Pagels had put on the wound got stuck as the blood dried. <u>Id.</u> at ¶36. It says that Pagels ripped the gauze off, which caused the wound to start bleeding again. <u>Id.</u> The complaint asserts that Pagels then sprayed the wound "with something" and put cream on it. <u>Id.</u> at ¶38. It says that at this point, the plaintiff told Pagels that he needed stitches, and that she wasn't treating the wound correctly; Pagels responded that she would not give the plaintiff stitches. <u>Id.</u> The amended complaint says the plaintiff responded by telling Pagels that he didn't want a bandage or gauze, and that he told Pagels to leave him alone. <u>Id.</u> at ¶39.

23

Even if the Clerk of Court had entered default at the plaintiff's request, and even if the court were to assume that Pagels admitted all the facts recounted above, the plaintiff would not be entitled to default judgment, because he has not established that he is entitled to judgment under the law. "Once the default is established, and thus liability, the plaintiff still must establish his entitlement to the relief he seeks." In re Catt, 368 F.3d 789, 793 (7th Cir. 2004). The plaintiff's own complaint proves that Pagels gave the plaintiff medical treatment. Right after the officers removed the plaintiff from his cell, Pagels cleaned the wound and put gauze on it. Later that evening, it appears that she came back, removed the gauze (although that made the bleeding start again), sprayed the wound and put ointment on it. She was going to cover the wound, but the plaintiff said he didn't want a bandage or gauze and told her to leave him alone. This is not deliberate indifference. This is not refusing to take steps to address the plaintiff's serious medical need.

The plaintiff disagrees with the treatment Pagels provided. He believes that instead of cleaning and dressing the wound, Pagels should have stitched it, or had someone else stitch it. But Pagels, as a nurse, is a medical professional. "When a medical professional acts in [her] professional capacity, [she] 'may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." McGee v. Adams, 721 F.3d 474, 481 (7th Cir. 2013) (quoting Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011)). "[N]either medical malpractice nor a mere disagreement with a [medical professional's] medical judgment amounts to deliberate

indifference." <u>Greeno v. Daley</u>, 414 F.3d 645, 653 (7th Cir. 2005) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)). The plaintiff has pled only a disagreement with Pagel's treatment decisions.

The court notes that the plaintiff asks the court to award $610,000 for pain and suffering and punitive and compensatory damages, which he describes as $1,000 for each day that he has "had to endure the pain and suffering from the failure of def. Nurse Pagels to provide adequate treatment to a laceration on" his right arm. Dkt. No. 41. The plaintiff has presented no evidence in support of these claimed damages, and even in a default situation, the court does not treat a plaintiff's allegations as to *damages* as admitted.

The court will deny the plaintiff's motion for default judgment as to Pagels, and dismiss the case as to Pagels because the facts in the amended complaint are not sufficient to entitle the plaintiff to judgment under the law.

C.     <u>Brown County—Failure to Train</u>

At the time the court screened the amended complaint, the court allowed the plaintiff to proceed against Brown County because he alleged that it had failed to train its employees to detect and prevent the plaintiff's self-harm. Dkt. No. 14 at 13. Because the court has found that the county employees were not deliberately indifferent to the plaintiff's serious medical need, however, the court must dismiss the failure-to-train claim. <u>Jenkins v. Bartlett</u>, 487 F.3d 482, 492 (7th Cir. 2007) ("there can be no liability under <u>Monell</u> for failure to train when there has been no violation of the plaintiff's constitutional rights.")

D.     <u>Brown County—First Amendment</u>

The court also allowed the plaintiff to proceed on a <u>Monell</u> claim against Brown County because the amended complaint alleged that the jail had a

policy, custom or practice of denying religious materials to inmates in the restricted housing unit. Dkt. No. 14 at 15-16 (citing <u>Monell v. New York City Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978)). The court must consider whether such a policy, custom or practice existed, and if so, whether it caused the constitutional deprivation. <u>Glisson v. Indiana Dep't of Corr.</u>, 849 F.3d 372, 379 (7th Cir. 2017).

There are at least two problems with the plaintiff's First Amendment claim. First, he asserts that he did not receive "religious materials;" his summary judgment materials explain that these materials included books, songs and prayers. Dkt. No. 38 at ¶49; Dkt. No. 37 at 16. The plaintiff has not explained why he needed these materials to practice his religion. He does not identify his religious affiliation. He does not allege that he could not practice his faith without these materials. He simply states that he was denied these items on one or two occasions. Even if a county employee had denied the plaintiff these materials, he has not provided evidence that this denial denied him his right to practice his religion under the First Amendment.

Second, the only evidence the plaintiff provides to support his claim that there was a custom, policy or practice of denying religious materials to inmates in the restricted housing unit is a single communication by a jail complaint examiner. On July 29, 2016 (the same date as the cutting incident), the plaintiff filed a grievance alleging that his religious materials requests were being denied. Dkt. No. 68-1 at 5. He stated that he had spoken to the Chaplain, who told him that on more than one occasion she had sent him religious books and songs, but that the plaintiff had not received those items. <u>Id.</u> The complaint then said, "As this is no where to be found: this felt in to

(retaliation) (violating my right to practice my religion) as well (violating the protection of the Fourteenth Amendment about my religion). Id. The complaint examiner responded to the complaint:

> The Chaplain verified that she sent materials for you. She also stated that it has been a regular occurrence for items she sends down to either be sent back to her or for inmates to tell her they've never received them. Your grievance is founded on the complaint that religious materials were not delivered to you. Considering this is an issue has been affecting inmates other than you and has been going on longer than you have been here, your claims that this is for retaliation are unsubstantiated and are deemed unfounded.

Dkt. 70-1 at 6. The court reads this response to mean that the examiner believed that because *other* inmates were complaining about not receiving materials, the fact that the *plaintiff* hadn't received materials was not the result of jail staff retaliating against the plaintiff personally. On that basis, the examiner dismissed the complaint.

The plaintiff sees this one statement as conclusive evidence that the county had a policy or practice of denying religious materials to inmates. To prove the existence of a policy or practice—even an unwritten one—a plaintiff must do more than cite evidence that something has happened more than once, or to more than one individual. The examiner stated that "this is an issue [that] has been affecting inmates other than you and has been going on longer than you have been here." Id. The examiner did not say that jail staff routinely refused to provide religious materials to inmates. The examiner did not say that jail staff refused religious materials only to inmates in restricted housing. The examiner did not say how many inmates had not received materials, or under what circumstances, or how long the problem had existed.

The defendants agree that there are restrictions on how many books and other items inmates in restricted housing may have. They have stated legitimate security reasons for the restrictions. Inmates may deface books, or tear out the pages and use them to clog drains or to block their cell windows. Dkt. No. 45 at ¶¶101-105; Dkt. No. 64 at ¶¶101-105. The complaint examiner said only that other inmates had not received religious materials they requested, without explaining whether those inmates were subject to the legitimate security restrictions the defendants described. An inmate in restricted housing may have one religious book; the complaint examiner's statement didn't indicate whether any of the complaining inmates were in restricted housing and already had their one, allowed religious book.

Even if the complaint examiner's statement was enough to show that there is a long-standing problem with inmates not receiving religious materials, that does not, by itself, show that the problem is the result of a policy, custom or practice. Inmates might not receive materials because request forms get lost, or because the Chaplain or the prison library does not have the books or materials, or because another inmate intercepts the materials. "A person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government . . . ." Vodak v. City of Chi., 639 F.3d 738, 747 (7th Cir. 2011). The Chaplain has stated that she has no reason to believe there is such a policy, and that her "overall experience has been that the [jail] administration has always been very supportive of inmates receiving religious materials and practicing their religion while incarcerated." Dkt. No. 47 at ¶7.

The plaintiff responded by citing the examiner's response to his complaint. Dkt. No. 64 at ¶97.

The plaintiff has not raised a genuine dispute as to an issue of material fact on his First Amendment claim, and the court will grant judgment in favor of Brown County on that claim.

## III.    MOTION TO INTERVENE (DKT. NO. 77)

The plaintiff's jailhouse "legal coordinator," Glenn Turner, filed a motion asking the court to allow him to intervene under Fed. R. Civ. P. 24(a)(c). Dkt. No. 77. He asks to intervene because he has put substantial work into the case, because the plaintiff suffers from mental illness and because he wants to protect "his interest" and keep the plaintiff up-to-date on the case in case the plaintiff gets transferred to another facility. Id. at 1-2.

The court will deny Mr. Turner's motion. Rule 24(b)(1)(B) says that a court may allow an individual to intervene in another person's lawsuit when the person seeking to intervene "has a claim or defense that shares with the main action a common question of law or fact." Mr. Turner has stated no such claim or defense. The plaintiff's suit is based on the events that surrounding his threat to harm himself; the court cannot see how Mr. Turner could have a claim or defense that he shares with the plaintiff. Even if he did, the court is dismissing the plaintiff's case on the grounds explained above, so there will be no future litigation in which Mr. Turner could participate.

## IV.    MOTION TO SEEK AN ALTERNATIVE RESOLUTION UNDER CIVIL L.R. 16.4 (DKT. NO. 80)

The plaintiff has asked the court and defense counsel to agree "to seek an alternative dispute resolution" under this court's local rules. Dkt. No. 80. He says the court never gave him the opportunity for alternative dispute

29

resolution, which he says is required by the local rule. He also indicates that he is "about to leave the custody of the Department of Corrections to possibly be turned over to Immigration, officials," which would make it hard for him to litigate the case. Id.

The court believes the plaintiff is referring to Civil L.R. 16(d), which gives judges in this district the discretion to conduct an alternative dispute resolution evaluation conference early in a case to decide whether the case is appropriate for alternative dispute resolution. Contrary to what the plaintiff states, the rule does not require the court to offer parties the opportunity to participate in alternative dispute resolution.

The court does often offer parties the opportunity to participate in mediation if the case survives summary judgment. Because the court is dismissing the case, it will deny the plaintiff's motion for alternative dispute resolution.

## V.    CONCLUSION

The court **DENIES** the plaintiff's motion for summary judgment.  Dkt. No. 36.

The court **DENIES** the plaintiff's motion for default judgment. Dkt. No. 41.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 43.

The court **DENIES** the motion to intervene. Dkt. No. 77.

The court **DENIES** the motion for alternative dispute resolution.  Dkt. No. 80.

The court **ORDERS** that this case is **DISMISSED**.

The court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 31st day of July, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**